May it please the Court, my name is Deirdre McDonald, and I represent the Northern Alaska Environmental Center, the National Audubon Society, and the other plaintiffs in this matter. The decision that my clients have challenged here today is a decision that grants the rights to oil development across an 8.8... Counsel, let me ask you about that. You said grants the right to oil development, but I thought the decision was just about granting the right to sell leases, and there's still going to have to be a separate decision about drilling in each case. Under this decision, nobody can drill a hole. Is that right? No, I don't believe that is correct. The leases are about granting the right to develop oil. That's the decision made. I know they're about that. That's the purpose. But the language, I'd like to... Does the lease let anyone drill a hole? It gives a person a right to drill the hole. Yes, it does. And I'd like to quote the language of the leases themselves, because I think that's the most relevant place to look for what they're granting. And the leases themselves say that they are granting the right to drill for, extract, remove, and dispose of all oil and gas together with the right to build and maintain necessary improvements thereupon. That's what the leases grant. That's why this... They don't need a separate permit in order to do that? You do. But when I buy a building lot, I'm buying a lot to... I'm buying the right to occupy and use that land. Yes, I have to go to the building department and get various permits, but what I've got... This is a different kind of thing. This is more like if you had to go to the seller. If the seller sells you the lot for a building, but you have to go back to the seller to get permission to build, kind of like when somebody sells a lot that's in his view, and you have to go back to him for permission to build so that he can make sure where you build won't affect his view. Right, but BLM has not retained the right to say no to development. They've granted the right for the oil companies to develop. What they've retained is some rights around the margins to make suggestions regarding siting and how things are done, but it's given up the right. And under the case law, that's the relevant thing here, is have you given up the right. Would there be any further environmental assessments? What would they be? There will be further environmental assessments, but they won't consider whether it was appropriate to lease this area, and they won't consider whether this area is appropriate for oil development. They will only consider... The purpose and need of those statements will say, of those environmental assessments will say, the purpose is to decide what mitigations to apply to this oil development facility. It won't reconsider whether they grant the rights to develop. And that's what this challenge is about. So if you could give the rights in a far-out analogy. This is analogous to a decision that you can build an apartment building on a piece of property and then later on they'll determine whether or not it has the right setbacks and all that kind of stuff. Yes. That's exactly analogous in my mind. And what we're challenging here, what this case is about, is before giving up those rights, BLM has to fully assess the impacts and the alternatives under the National Environmental Policy Act and the Endangered Species Act. What my clients believe is that if a full assessment had been done here before the decision was made, that BLM would have been able to strike a better balance between oil development and protection of the vital resources in this 8. million acre area. Congress seems to have thought that the vital resource in the area was oil in order to relieve the nation's oil shortage and they specifically said that the government should be expeditious in granting leasing rights. Yes, they did. But when Congress designated this area as a petroleum reserve in 1976, it also recognized 1923, I think, is when they designated it for petroleum. Excuse me? Well, that's when it was designated as a naval petroleum reserve. In 1976 is when it was designated the National Petroleum Reserve in Alaska by Congress and it was put under the jurisdiction of the Department of Interior, in part because Congress recognized that there were outstanding natural values there. And at the time, Congress did designate it as a petroleum reserve, but it also instructed the Secretary to protect surface resources and it instructed the Secretary to designate special areas that were deserving of even greater protections and instructed the Secretary to give those special areas maximum protection under any leasing that happened. So Congress recognized the wildlife values and nor did it waive any other applicable environmental statutes. So Congress intended for there to be some balance here. Yes, it is a petroleum reserve, but it also said protect outstanding natural values and it recognized that there were outstanding natural values. There are birds, migratory birds, from every continent in the world travel to the petroleum reserve in Alaska to nest and molt every summer. This has resources, this area has resources that are important, not just to the people who live there and rely on them for subsistence, but to people nationally and even internationally. I'd like to focus... What does that have to do with leasing oil drilling rights? I mean, there's nothing about leasing oil drilling rights that implies that the oil companies, if they do bid in some leases, will shoot all the birds. No, but the EIS itself, although it doesn't contain a complete analysis, recognizes that there are impacts on birds from industrial development. You're talking about gravel paths, roads, pipelines, and oil wells. They can't be put in sensitive habitat areas with no impacts. That's why I asked you the first question I asked you. Can they drill a hole with these leases? And the answer is yes, provided they get another permit, and that permit is going to be about whether where they plan to drill the particular hole is going to have an undue impact on the birds and the other natural values. Yes, but at that point, the BLM has not retained the right to say no to drilling, so there's only so much they can do to protect resources. At least not on the grounds of iron metal. They haven't retained the right to say no on any grounds. Any grounds. No. They can modify, they can impose suggestions and stipulations, but only on the margins. It's the same as what the court considered in Conner v. Burford and said that you've given up the right when you grant a lease that doesn't have a strict, no-surface occupancy stipulation, which none of the leases here have. Wait a minute. You can't get a reversal on the basis that we don't agree with what the administrative agency did. It has to be on the basis that it didn't give a hard look and was arbitrary and capricious in ignoring possibilities. Right, right. And that's exactly where we are. Given that there is a commitment with these leases, the question is, did they do the site-specific analysis that's required by that commitment? California, if you'd block, says specifically and unambiguously that when you make the commitment, you need to do a full site-specific analysis. How can they be site-specific here? This is a huge area that is largely uninhabited, unexplored, and nobody really knows where any oil is. Until there's some oil exploration, it's hard to see what to study. Well, what the agency can study is the resources on the ground. It needs to look at the area's lease and determine can they be developed without undue impacts on the surface resources, on water bodies, on wildlife, on subsistence uses, on scenic wilderness areas. You're dealing with an area that's bigger than a lot of countries in Europe. Yes, yes. Until you know where the oil companies actually want to drill, how do you know what site to look at? Well, they need to look at the sites they choose to lease. Yes, it is a big task, but BLM set up that task. It's not just a big task. It seems to me like an undoable task because you don't know what to look at. I mean, it's like saying do a site-specific analysis of France. Well, would you like me to look at Paris, or would you like me to look at different villages in Brittany, or what? I have no idea where to look. Well, my answer to that is that BLM made the choice of the size of the planning area. If they want to give up the right to say no to development across an 8.8 million acre area, yes, they do have a big task. But that's the agency made its bed. That was its choice, and the courts have recognized when you make a choice like that, that's the same thing the court said in California v. Block. When you make a decision across a huge area all at once, yes, you have a lot of analysis. The greater the area, the larger the potential environmental impacts, I would suppose. Right. And what I would say here is that BLM had other choices. It could have leased a smaller area. There are maps that show the area it designated as high oil potential. Here's my problem with what you're saying. Lease a smaller area. Oil companies are very secretive about their own geological investigations. BLM doesn't do the geological investigations that oil companies do. Until they put it up for leasing, chances are a lot of areas nobody will bid because the oil company's secret information will indicate that it's not worth the money it would cost to look for oil there. Until they find out what the oil companies bid in and where somebody's going to look, I don't see how they even know how to do a site-specific. With Crudeau Bay, the oil companies didn't even bid in most of Crudeau Bay because they didn't think there was any oil there, just particular sites. In this case, BLM had enough information to designate an area as the high potential area. And as a matter of fact, it was so confident that that was the area that was going to be in play that it told the Fish and Wildlife Service to base its biological opinion on the assumption that all oil activity would happen in that high potential area. I would submit that it would be reasonable for them to conduct the lease sale focused just on that high potential area if they're so confident that that's where the activities are going to occur. In addition, rather than there are other options besides... How big was that high potential area? You know, I don't have the number offhand, but there is a map of it. Is this the map? Yes, that's the map, and you'll see that it's a relatively small portion of the planning area that's designated as high potential there. It appears that the largest area is low potential. Yes, that's correct. I'd like to mention two other options that the agency had if it found that analyzing this entire 8.8 million acres was undoable. One is to use the tiering process that is set out in NEPA, and it could have done that by starting with a planning document and looking at it at a planning level of designating potentially appropriate areas for leasing, and then it could have tiered individual EAs or EISs for smaller lease sales from the larger planning document. Another option that the court mentioned in Conner v. Burford is to issue strict NSO leases. The court in Conner said that's a reasonable option, because then the agency has retained the right to say no to development, and so it can issue those leases and conduct site-specific analysis later when it makes that decision to give up the right. What it can't do is make the decision and then do the site-specific analysis after the decision has been made. That's too late. I'd like to move on, unless there are further questions, to our claim that the alternatives didn't consider a reasonable range. The problem in the EIS here is that BLM refused to consider a middle ground alternative that protected some vital areas, particularly in the high oil potential area, from development, while allowing enough of the area to be open to allow oil activities. The parties here agree on the legal standard that the existence of a viable, unexamined alternative renders the EIS inadequate. So the only question here is, was there such a viable middle ground alternative, and was it not considered? And here the question is simple. No, there was not a middle ground alternative. Consider, C is not a middle ground. In the EIS itself, the agency said C is essentially equivalent to the no-action alternative. Because C didn't allow any oil development activities, it didn't provide for any analysis of oil impacts. The agency concluded that the impacts of C are the same as the impacts of the no-action alternative. The preferred alternative, which BLM now holds out as a middle ground, is an extreme alternative. It makes 100% of the area open to leasing. It doesn't put any areas off limits. Here, and it's not just the plaintiffs that said these alternatives are all or nothing. It was the Environmental Protection Agency, the Fish and Wildlife Service, and even a for-profit native corporation that stands to gain financially from oil activities that said you don't have a reasonable middle ground alternative. What is the case that you're relying on that says that you have to essentially take a look at an alternative that's more middle ground than the one you looked at? Well, California v. Block is one of those cases. V. Ray, that I just submitted a notice of supplemental authority, is another one of those cases. And in addition, there are many other cases cited in the briefs. One of my clients, the Audubon Society, developed a scientifically-based approach that put off limits the most vulnerable wildlife areas while still allowing access to 65% of the high-potential area. And the record shows that BLM found that it would be viable. It would support some leasing and some oil development. Indeed, the Audubon alternative actually meets the purpose and need better than Alternative C, which was considered in the EIS. So it's really untenable. They get to decide that, so long as they're not arbitrary and capricious about it, isn't that right? They get to decide what the purpose and need is. I mean, there's no point arguing to us and even persuading us that the Audubon alternative is superior. No, it's not a question of whether it's superior. BLM may well think that it's, you know, you may agree that the preferred alternative is superior. The question is, did they examine all viable alternatives? If it was a viable alternative, they needed to consider it in the EIS. How do you know that they didn't? That's what I'm not following. How do I know that they didn't? Because it's not analyzed in the EIS. The EIS analyzes the three alternatives that open 96 to 100% of the area, plus Alternative C that supports no oil leasing and the no-action alternative. I guess I'm having a little problem here with this. You seem to be saying if your clients actually put forward this alternative, is that right? Yes. So if outside interests put forward an alternative that they say is more reasonable, then that's good enough that the government has to take that into a consideration in its? No, I'm not saying that. What more is there here? There needs to be a middle ground alternative. It could be the Audubon alternative. It could be something substantially similar to the Audubon alternative. What we have, though, is a different strategy that was not considered. You don't need the old Audubon alternative, do you, to make that argument? No. Don't you just say they didn't consider it? No, it's just an example of something that was put before the agency, but no, they needed to consider it. But the real argument is that the alternative that they did consider wasn't middle ground enough for us. Yes, I'd like to answer that briefly. Alternative C does not support oil development. So when they did the analysis of Alternative C, they said the effects of Alternative C are the same as the effects of the no-action alternative. So that wasn't analysis. That wasn't analysis of what happens if we have an oil development program, but we have blocks of habitat protected. I'd like to spend 30 seconds on the Endangered Species Act and hopefully reserve 30 seconds for rebuttal, if I may. Our argument in the Endangered Species Act in one sentence is that what the biological opinion considered was not the entire agency action. It was based on these assumptions that are not enforceable. So if the law is clearly established that the consultation has to consider the entire agency action, not just some subset of it. Okay. Thank you. We'll give you a minute for rebuttal. Thank you. My name is John Bryson with the Department of Justice on behalf of the... You have to keep your voice up. ...Secretary of the Interior Bureau of Land Management and Fish and Wildlife Service. I will take 15 minutes with me at council tables, Jeffrey Lepo, who on behalf of the engineers will take five minutes. The challenge here to the oil and gas sale lease is a challenge here under NEPA and the Endangered Species Act, and this Court's standard review is well settled. They cannot set aside the agency action unless it's found to be arbitrary and capricious and lacking a rational basis in the record here. The agency gets deference to its choice of methodology, its choice of analysis, and its general conclusions here. And NEPA, of course, is a statute that does not require the agency to strike a particular balance between the values that are assessed. Here Congress has passed the Alaska National Petroleum Reserve Act and clearly stated that the Interior Department has to undertake an oil and gas development program for the reserves, but also to seek to protect the surface resources to the extent possible and appropriate. Now, the primary issue here is whether the EIS was sufficiently site-specific. There's no question here that BLM's obligation was to identify to the extent possible the impacts associated with the entire program of leasing, exploration, and development. That follows from this Court's decision in Conner v. Burford. Conner v. Burford was a case where the Court said that an EIS had to be prepared. It did not say exactly what kind of EIS and what methodology would be required in that circumstance. This is our case today. And the issue, therefore, is whether what BLM did meets the standard of site-specific analysis in light of what is the undeniable reality, which is that oil and gas development on the North Slope is a very risk-based enterprise, that exploration, there's no way to know  and that... Why is that? How do you say that? Are you making that as a statement of law or a statement of fact? That is a statement of fact and a conclusion that BLM has reached, and the plaintiffs here have never really offered any reason to disagree with that. That is the starting premise for this analysis, that you can employ all the best predictive models you might have, but the historical record is that something under 5 percent of any efforts to develop a resource actually pay off, because there's so many unknowns. No, that's true. It's true anywhere. Alaska has special considerations, Your Honor. It's a vast area, and it's a very costly place to go drill, Your Honor. So BLM in this case also made the very undisputed, basically unrebutted conclusion here that a successful oil lease has got to offer a very large area and will fail if certain restrictions are imposed. So you don't have to look at site-specific? No, we do, Your Honor, to the extent that we can on that stuff. We do not know where they are going to lease, we do not know where they're going to develop, and we do not know where they're going to explore. I understand it. Tell me if I've got this right. You offer properties for lease under a leasing program, but that doesn't mean anybody leases them. Is that right? A lot of them, they're offered and there are no buyers. That's correct, Your Honor. Not all the areas that were offered for lease through bids. What do you do? Do you have a grid and you lease squares in the grid? Do you offer squares in the grid for lease because some get bid on and some don't? Exactly, Your Honor. And the lease itself, as BLM recognized in the environmental impact statement, an oil lease does not itself authorize any on-the-ground activity because there's all these permits that have to be complied with and there will be environmental compliance that tears off the EIS. But here, what BLM did in the exhaustive detail and in the exhaustive analysis was to present a comprehensive catalog of the nature and location of all the resources, which is shown at the supplemental extractor records beginning at page 123 of our supplemental SEIS. Hundreds and hundreds of pages dealing with all sorts of resources, biological resources, cultural resources, physical resources. And then it prepared a hypothetical development scenario. If an expiration pays off, they explain in extreme detail of how it would be developed, what the physical aspects would be. They also reached the conclusion, which is unrebutted by the plaintiffs, that it was unlikely that in the end you would have more than eight fields that would go to full development over a 30- or 40-year period. Then what BLM did was to take its exposition of where the resources are, its determinations that only a small footprint would actually in the end be affected in any way, and then it said as to ash resource, well, the soils here are not going to be disturbed too much, but if the development's over here, they might be disturbed more. If birds are unevenly distributed, if development occurs where there are not many birds, there's not going to be much of an impact. But if we drill here, there won't be. And you can't expect them. And the question is whether that's a reasonable methodology to meet the site-specific requirement. And here BLM gets the deference, because the plaintiffs have not shown that methodology was arbitrary and capricious. But that methodology is different than it would have been if you had, I take it, Are you saying that if you had an idea of where you were more likely to drill, it would have been different? I could very well have been, Your Honor. Then I don't understand why there are these maps that indicate where it's more likely that oil is to be found. Well, the maps are where the potential or high potential is based on the prediction or analysis of what might, where the geologists and the BLM's expert geologists think that the big payoff is going to be. You didn't do an actual site-specific analysis with respect to oil? As I understand it, geologists can say in a very general way, some kinds of areas are more likely to produce oil than others, like you don't find too much on top of mountains. And to know more specifically, geologists can also do that, but it costs a vast amount of money to do the more specific analysis. So the oil companies do it, keep it secret, so that their competing bidders won't know it. Is that the way it works? I'm not sure I can answer that question definitively, Your Honor, because I don't know exactly how the oil companies approach this. What I know is that BLM was able to make some prediction about where the high potential was in a general sense, but it reached the conclusion that because it could not identify exactly where it was going to happen  that its methodology for understanding the impacts has to be somewhat modified. You're not arguing that you can't do an environmental assessment of the places where it's more likely to have oil because you want to protect the secrecy of the oil companies? No. It's more like BLM does kind of a flyover analysis of where there's likely to be oil, and the oil companies do a walking around on the ground. There's an exploration stage here, which BLM does not explore. That's part of the leasing program, which is to attract the oil companies to make that level of investment for exploration. A lot of this land no human foot has ever trod on? I think that's correct, Your Honor. But if they drill, they will. But what BLM's point was is they drill, and there will be human impact, but it will be in a very localized, small area. So we don't ever have to study what the impact will be in that small area? Well, no. In order to make this decision about granting leasing development and exploration rights, we need to know as much as we can. At each stage of that process, there are going to be permits to undertake particular activities at particular locations, and the impacts will be examined in greater detail at that point. Will there be another EIS? It depends entirely on whether the activity would be a major, significant action with significant environmental impacts. Whether it's EIS or EA or a categorical exclusion depends entirely on the application of NEPA to that particular application to do a exploratory well, for example, or to build a relatively permanent development process. Those decisions are made almost presented. But for the exploration, there will never be any other? Oh, no, no, no. A permit to do anything on the ground, including exploration, will require a permit. Another EIS? It's doubtful that exploration will require EIS, but it may be resolved on EA, because it may be able to tier to this EIS. And that's how DLM has set up its NEPA compliance over that period of time. What does exploration entail? Some exploration activity involves going on and doing what they call seismic surveys, and all the exploration activity would occur during the winter months. That's one of the limits. Does it involve drilling? Yes, because they can drill an exploratory well. That would have an impact on the environment? It certainly would, Your Honor. And the degree to which it has to be examined, when a permit comes in to do that, it depends on precisely where they want to put that exploratory well. Can you control that before they drill? Well, we cannot, yes, because DLM has the authority under its permitting regs to say that, well, you know, we really ought to put it just a little bit over there or something like that, and then there won't be any problem. I mean, they have the authority to say, you know, this is the conditions under which you can put this exploratory well, and it has to be here as opposed to there or something like that. How big are the squares? I think they're several hundred thousand acres. They're much larger than what's offered in the continental United States. Several hundred thousand acres. So a lot of them, there will be no bids, and you get a bid on one, and the oil company wants to do seismic and some exploratory drilling within the square of several hundred thousand acres, and they say they want to do it here because it looks promising. Can you tell them within the several hundred thousand acres, no, you can't do it there because the birds like that lake or something like that, do it over there where there's a lot of gravel anyway and it won't do any harm? I think the BLM has the authority to say, you know, your condition is that you can't put it exactly there, and that's especially so for the Endangered Species Act requirement here, because one of the stipulations is that BLM may require modifications to or disapprove a proposed activity if it's likely to result in a threat. So that authority has been reserved specifically for Endangered Species. Could you describe incidentally what seismic is? They do that before they spend the money on exploratory work. I'm not sure. I thought they made a noise. I think so. I think maybe they go from, you know, there may be two people, you know, separated, and there's some sort of connection with them, I don't know what it is, but they create something that sends echoes through the ground so they can get a sense of the profile. Making a noise and seeing from the bounce where there's activity. They get a profile of geological formations underground, something like that. And on the site specific, the last point I want to make was that no surface occupancy, BLM made a decision here which is not really rebutted either, which is that no surface occupancy would not promote one of the major goals here, which is to have a successful lease sale because of the enormous expense of investment. And so the fact that, you know, this Court said in the comment. The reason for having a successful lease sale was 42 U.S.C. 6508, notwithstanding any other provisions of law and pursuant to rules and regulations and expeditious program of competitive leasing of oil and gas in the National Petroleum Reserve. Right. And beyond the determination here, it's not arbitrarily precious that the kinds of leases issued here are necessary to have a successful lease sale. And I'll leave the remaining time for Mr. Ledlow. Good morning. Good morning. I represent the interests of the intervenors, Arctic Slope Regional Corporation, State of Alaska, ConocoPhillips, and Anadarko Petroleum Corporation. Before I start, I'd like to hand up a copy of Map 18, which is in the EIS. I think that might be useful. Your Honors. Arctic Slope Regional is a native corporation, Eskimo. Arctic Slope Regional Corporation, its shareholders are the people of the North Slope. That's correct. Inupiat. Thank you. Just for clarification, this is in the EIS. It's also in the Record of Decision. And it reflects the stipulations and restrictions which were the results of the preferred alternative as adopted in the Record of Decision by the BLM. So this is what ultimately occurred. And, for example, Your Honor, you can compare this to the high, medium, and low areas and see that in the high areas where the BLM projected this there was high interest. There are also many resources. There are also many restrictions. Those are up in the northeast corner. I wanted to start by answering the question that Judge Kleinfeld asked about whether there was an absolute right to permit here. And I find that paradoxically we're in the position where the conservation groups are here telling you that there's an absolute right to drill and that my clients, the oil companies among them, are saying that that's absolutely not true. And, of course, that would not normally be the case. But I think that the law is quite clear, and I'm quite comfortable in making that point. The Record of Decision, as Mr. Bryson indicated to you, expressly states in it that this decision does not grant any on-the-ground rights. There is a permitting system. There are regulations. Those regulations which are attached to intervener's brief expressly provide to the BLM the right to cease all operations of whatever nature in the interest of conservation of surface resources. There are other statutes which these leases remain subject to. To cease them. To cease them. That's correct. But they don't have any further environmental evaluation before authorizing them to. No, that's not correct, Your Honor. Okay. Well, then tell me. In order to obtain, as Mr. Bryson was indicating, in order to obtain a geophysical permit, which would be necessary for seismic, which doesn't actually disturb the ground, it is bouncing sound or other waves in the wintertime when the sensitive resources are not there or they're covered by ice. That requires a NEPA review. Whether it requires an EIS or not, you talked about, but it does require a NEPA review. Yes. And it further requires and allows the BLM to condition or deny the permit on the basis that the resources affected would be disproportionate to the. Right. But I guess what I'm having some trouble with is if you don't have any site-specific environmental review of the impacts now, how are you going to be able to evaluate what those impacts would be for any particular site in the future? Because there will have to be a site-specific evaluation at that time. And I don't agree that there hasn't been. I'm not understanding what the nature of that is. What statute do I look at or what regulation do I look at that says that there's. NEPA. NEPA would require, there must be a environmental assessment of the environmental consequences and alternatives before the BLM can provide a geophysical permit, for example, or an exploration permit. And that analysis must include a sufficiently site-specific evaluation to satisfy the requirements of NEPA. And so if you know where you're going to drill that. Do we have some cases interpreting that provision that would help me figure out what kind of. A case that specifically interprets. Yeah. That kind of evaluation. And I did not have one in mind. However, I think it's clear that it is a Federal action when you grant a permit. And if there is a probability of significant. What I'm trying to figure out is the scope of that review. Sure. I think the scope of the review has to be site-specific. I don't have any doubt at all that that is the case. And. I don't. I don't. I don't have a problem with that. Okay. All right, Your Honor. Counsel, let me ask you this. I see your time is leaving. Let's see if I'm following you. When an oil company bids and gets a lease, before it can do what, must it have a permit? I'm sorry. Before it. Before it can essentially do anything. Conducting a seismic test. Before it conducts a seismic. Seismic drill in the ground. That's correct. Even making a noise and looking for the bounces requires a permit? In order to get the permission to do that, you have to go out and do a site-specific evaluation of what the resources are in the area, so that you ensure that you're not impacting those resources when you go out there and place your equipment. And so that's correct. The oil company does that? The oil company. Not the. That's correct. They have to seek permission. They have to get a right-of-way from the BLM, and then they have to get a permit to go out and do that. And that is true for every activity. One of the things that has sort of been contrasted in the briefing is the Outer Continental Shelf Lands Act, which has in its statutory provisions expressed divisions between leasing, exploration, and production. One of the things that's notable here is while the NPRPA doesn't have that in its statute, it has it in its regulations, the very same distinctions between leasing, exploration, and production. And so although it's not a statutory segmentation of approvals, it is a regulatory approval, which as a legal matter has the same consequence. Okay. You are over past your time. All right. Thank you, Your Honor. Thank you. We'll give the other side the same amount of additional time. You have about two minutes for rebuttal. Thank you. I'd like to briefly address the point that Mr. Bryson made about deference here. Yes, it's arbitrary and capricious review, but the agency's deference, and this is explicitly stated by this Court in Tenneckee Springs v. Block, the discretion under NEPA does not extend to the discretion to decide what, how much specificity must be in the environmental impact statement. That's dictated by NEPA law, and the agency has no discretion. I'd like to spend just a minute, if I may, on the methodology. Mr. Bryson also spoke about the methodology and said, well, this is the best we can do when we don't know where things are going to happen, is to do this general analysis. And what the general analysis does, the methodology they used, is to look at resources and to use that hypothetical development scenario he spoke with to project the total number of acres disturbed. It doesn't say anything about where those acres would be disturbed, nor does it say anything about which acres are more vulnerable to disturbance than others. All it says is, as to soils, which he cited, is that there will be several thousand acres of soils will be destroyed. And then it concludes, the conclusion that the impacts are minimal, are based on the hugeness of the planning area. It concludes, well, several thousand acres out of 8.8 million is not a lot, therefore the impacts are minimal. We believe if they had done an actual site-specific analysis, they would see that the impacts on individual resources are more than minimal. And the EIS itself acknowledges that, that there are real impacts on a site-specific level. There's a small portion that I might quote, if I may, from the EIS quickly. And it says that placement of gravel drilling pads, roads, airstrips, staging areas, and docks, and the activities that take place on them will permanently disturb or destroy soil and vegetation, impound and disturb water, disturb, displace, or kill fish and wildlife, risk disturbing or destroying paleontological and cultural resources, and potentially adversely affect subsistence and recreation. The agency isn't saying there's no impacts. Their conclusion that the impacts are insignificant is just based on the hugeness of the area itself. Okay. That will have to be the last word. Thank you. The case disargued is submitted for decision, and we'll hear the next case.
judges: Schroeder, Alarcon, Kleinfeld